# Humphreys *versus* The County of Armstrong.

1. It is the duty of county commissioners, being informed that a county bridge was unsafe, to examine it thoroughly, and repair it so as to render it perfectly safe, or to close it up so as to prevent the public from using it.

2. A bridge fell as a resident in the neighborhood was passing over, and injured him. In an action by him against the county, the court charged that if the plaintiff knew the condition of the bridge, notice or warning to him would not be necessary. *Held* to be error.

3. The passing of the plaintiff over the bridge with knowledge of its unsafe condition, but without distinct notice to him or the public not to use it, was not contributory negligence on his part.

November 6th 1867. Before WOODWARD, C. J., THOMPSON, STRONG, READ and AGNEW, JJ.

Error to the Court of Common Pleas of *Armstrong county:* No. 96, to October and November Term 1867.

This was an action on the case, brought January 30th 1862, by John A. Humphreys against the county of Armstrong, to recover damages for injuries received by him in consequence of the falling of a bridge whilst he was crossing it.

The bridge was a county bridge, erected at Rockport Mill, over Red Bank creek, a stream which is there the dividing line between Armstrong and Clarion counties. The bridge had been built at private expense in 1850, but by Act of Assembly of April 11th 1859, it was declared a county bridge, to " be governed by the laws relating to bridges on county lines."

On the 10th of November 1860, the plaintiff, with two other men, were slowly driving over the bridge in a wagon drawn by two horses, when the span on which they were went down. The whole floated down the stream about a mile and a half, when they

[Humphreys *v.* Armstrong County.]

were caught on a rock and were landed. The plaintiff was severely injured, his scull having been fractured.

There was evidence that in the spring of 1860 the bridge was in so bad a condition that the constable of the township reported it to the court; that it was shut up afterwards for a while, and then opened.

There was evidence also that both the supervisors of the township had examined the bridge, and found the wood of the large braces rotten, and, considering it unsafe, closed it up twice, but it did not remain closed, because there was no other way of getting over. In September 1860 the commissioners of Armstrong county were notified that the bridge was unsafe and needed repairs. They examined it, found the braces and sills decayed, and " came to the conclusion that by tightening the nuts, and putting on some new plank, it would do till spring, as they were scarce of funds." They made a contract for putting on plank, limiting the expense to $30 or $40, but they did not think that such repairs would strengthen the sills. The bridge was thus repaired, and the public travelled over it.

There was evidence that the plaintiff knew the condition of the bridge, also that he advised others to cross it, and that wagons had passed over it safely on the day on which it fell.

The plaintiff's 1st and 3d points, with answers of the court (Buffington, P. J.), were as follows:—

1. It was the duty of defendant to put and keep the bridge in proper order, and the defendant was bound to use extreme diligence and care in that behalf; the slightest neglect against which human prudence and foresight might have provided, will render the defendant liable to answer in damages.

Answer: "This point, as a general rule, with some modification and explanation, is affirmed. I cannot say, however, that the law requires 'extreme diligence' on the part of county officers. We think it was their duty to keep it in repair, and a failure to perform that duty, in the spirit of their public obligations, would be a breach of that duty, and would be such negligence and carelessness as would render the county liable for any loss resulting from such negligence. Neither do I think that 'the slightest negligence against which human prudence and foresight might have provided' is sufficient to charge the defendant. Reasonable and ordinary care is all that is required of the officers, and the want of that would be negligence sufficient to charge the defendant."

3. If the defendant permitted the bridge to be used without warning the public of its imperfect condition, they cannot charge the plaintiff with inexcusable negligence or want of ordinary care in using it; and if the jury believe that such was the fact, then their verdict must be for the plaintiff.

[Humphreys *v.* Armstrong County.]

Answer: "This point, under the evidence and circumstances proved in this case, is answered in the negative. How it might be if the plaintiff had been a stranger in the neighborhood it is unnecessary to say. Perhaps notice or warning in such cases might be necessary. But if the jury believe that the plaintiff knew the condition of the bridge, then notice or warning to him would not be necessary."

The defendant's 6th and 8th points, which were affirmed, were:—

6. If the jury believe that the plaintiff knew the bridge was unsafe, and yet advised others to pass it, and in doing so himself was injured, he (the plaintiff) contributed to his own injury and cannot recover.

8. If the plaintiff, with a knowledge of the unsafe character of the bridge, by rash conduct or other negligence contributed to his own injury, he cannot recover.

The court, in answer to these points, said:—

"If there was concurring negligence, that is negligence both by the plaintiff and defendant, and the plaintiff in such a degree that both contributed to the injury although the negligence of the defendant may have been of a greater degree, there can be no apportionment of the negligence to the injury, and the plaintiff being in fault to any such extent has no reason to complain. When both parties are in fault, neither can hold the other liable."

In the general charge the court said to the jury:—

"You will decide whether the plaintiff knew, or had the ready means of knowing, that it was dangerous to cross the bridge in its existing condition. If he were well aware that it was dangerous, and with foolhardy rashness drove over it, and thus by his own recklessness and carelessness brought the injury on himself, or by his negligence to such a degree as contributed materially to the casualty, he cannot recover."

The verdict was for the defendant.

The plaintiff took a writ of error, assigning for error the answers to the points and the portion of the charge given above.

*D. Phelps* and *D. Barclay*, for plaintiff in error, cited Acts of April 13th 1843, Purd. 878, pl. 75, Pamph. L. 221; May 5th 1854, Pamph. L. 561; Erie *v.* Schwingle, 10 Harris 389; Pittsburg *v.* Grier, Id. 54; Laing *v.* Colder, 8 Barr 482; Penna. Qailroad *v.* Zebe, 9 Casey 329; Beatty *v.* Gilmore, 4 Harris 463; Denn *v.* Milford, 5 W. & S. 545: Bartlett *v.* Crosier, 15 Johns. 253; 2 Greenl. Ev. § 232; Penna. Railroad *v.* McTighe, 10 Wright 316; Jones *v.* Wood, 4 Harris 25; Sartwell *v.* Wilcox, 8 Id. 117.

*E. S. Golden*, for defendant in error, cited McCully *v.* Clark,

[Humphreys v. Armstrong County.]

4 Wright 399; O'Brien v. Ph., W. and B. Railroad, 3 Phila. R. 78; Beers v. Housatonic Railway, 2 Am. R. R. Cas. 123; 19 Conn. R. 566; 1 Hilliard on Torts 137, 140, 141, 146; Brannan v. May, 17 Geo. 136; Griffin v. Mayor, 5 Seld. 456; Gorman v. Bangor, 38 Me. 443; Lane v. Crombie, 12 Pick. 177; Adams v. Carlisle, 21 Id. 146; Chicago v. Mayer, 18 Ill. 349; Moore v. Abbott, 32 Me. 46, 574; 2 Hilliard on Torts 141; Hyde v. Jamaica, 1 Williams 443; Simpson v. Hand, 6 Wh. 311; Railroad v. Skinner, 7 Harris, 298; Railroad v. Aspell, 11 Id. 147; Reeves v. Del. Railroad, 6 Casey 454; Railroad v. Zebe, 9 Id. 318; Whitehead v. Philadelphia, 1 Phila. R. 99; Butterfield v. Forrester, 11 East 60; Marriott v. Stanley, 1 M. & G. 568; Flower v. Adam, 2 Taunt. 314; Furman v. Concord, 2 N. H. 292; President of Mt. Vernon v. Dasouchett, 2 Carter 586; Penna. Railroad v. Henderson, 7 Wright 449.

The opinion of the court was delivered, October 26th 1868, by READ, J.—By the Act of 13th June 1836, relating to roads, highways and bridges, county bridges over any river, creek or rivulet on the line of adjoining counties shall be built and be maintained and kept in repair by the commissioners of such counties at the joint and equal charge of both counties; and if either county shall necessarily incur more than its due proportion of such charge, it shall be lawful for such county to recover from the other county the excess so incurred, in an action to be founded on this act. By a supplementary Act of 13th April 1843 (Pamph. L. 221), it was made the duty of the county commissioners of the several counties of this Commonwealth to repair all bridges erected by the county, and to pay the expenses of such repairs out of the county treasury in the usual manner, except (amongst others) the county of Armstrong; but by an act, "relative to roads and bridges in Armstrong county," of the 5th May 1854, this exception was repealed, and the provisions of said Act of 1843 were extended to the county of Armstrong.

A bridge had been erected by private subscription over Red Bank Creek in 1850, and on the 11th April 1859 the legislature passed "an act declaring a bridge between the counties of Armstrong and Clarion as a county bridge."

It recites that "the bridge across Red Bank creek, where the public road crosses said creek at the place known as the Rockport Mill, has been built by individual enterprise, and that the expense of keeping said bridge is too great for the townships adjoining," and then enacts, "that the bridge which is now built across Red Bank creek, between the counties of Armstrong and Clarion, at the place known as the Rockport Mill, be and the same is declared a county bridge, and to be governed by the laws now in force in relation to bridges built on county lines."

[Humphreys *v.* Armstrong County.]

The bridge had been built about ten years, and had been a county bridge one year and seven months when it fell. On the 10th November 1860, about three o'clock in the afternoon, whilst the plaintiff and two other men in a wagon, with a grist of ten bushels of buckwheat, were crossing the bridge at a slow walk, it broke down and the whole span went down, the Armstrong end of the bridge going down first. All floated down the creek together, and landed about one and a half miles down, caught on a rock, scattered the bridge, and the horses went out on the Armstrong side.

The defendant got his wound on the falling of the bridge. His frontal bone was fractured, and he was trepanned. He was very ill for several months, and the injury left him deaf of one ear, and when his physician attended him he thought he would never be able to attend to business.

This action is brought to recover damages for this injury. The natural inquiry was therefore as to the actual condition of the bridge previous to and at the time of the accident. The evidence is principally, if not entirely, confined on this point to the year 1860.

Two of the supervisors examined the bridge in June, and in the large braces found the wood rotten. They ran their knife-blades in the whole length. The timbers were rotten—the ends of all the timbers. Examined the end of the sill and end of the brace, and found them rotten. Both thought the bridge unsafe, and it was closed up twice in that month by one of them.

Two of the Armstrong and two of the Clarion county commissioners, some time afterwards, examined the bridge, the Armstrong commissioners having been notified that it needed repairs and was unsafe.

They did not make any particular examination of the bridge, and gave a contract to Mr. Putney to fix it; it was plain it needed a good many planks, say 1000 feet of plank, and tightening screws and braces. They did not examine the extent of the rottenness nor close up the bridge. Putney was limited to $30 or $40. In looking at the sills they saw they were rotten. The laying on the plank and tightening the screws would not strengthen the sills. One of the commissioners who examined the bridge said, "We came to the conclusion that by tightening the nuts and putting on some new plank it would do till the next spring; we had a number of bridges to build, and were scarce of funds."

The repairs directed by the commissioners were made, and after it was repaired every person travelled on it, and it was generally used by the public, and Amos McMillan, one of the persons in the plaintiff's wagon, had crossed the bridge the morning of the accident.

It was the duty of the commissioners to have examined the

[Humphreys *v.* Armstrong County.]

bridge thoroughly, which they did not, and to make a thorough repair so as to render the bridge perfectly safe, or to close it up so as to prevent the public using a dangerous part of the highway of which they could not have any accurate knowledge. They did neither, but merely did that which they thought would make it last till spring, becoming *quasi* insurers that it would last so long.

The evidence on the part of the defendants as to the dangerous character of the bridge was very strong, and the learned judge said, " Among all hands certainly the bridge has been proved to be a most deficient structure and in a bad, dangerous condition."

The duty of the defendants was therefore plain and positive to close up the bridge, and if it had been done this accident could not have happened. In Gibbs *v.* Trustees of the Liverpool Docks, 3 Hurlst. & N. 164, the Exchequer Chamber held, that when they knew the dock could not be navigated without danger they should have closed it to the public, " and for the consequences of this breach of duty we think they are responsible in an action." This was affirmed in the House of Lords ; Law Rep. 1 H. L. 98, June 5th 1866 ; Eng. & Irish Appeals, 35 L. J. R. Exch. 225.

Instead of this they permitted it to be used by the public generally with loaded wagons and horses and on foot. This was clearly a breach of duty, and in relation to a structure forming a necessary and essential part of a highway across a deep and rapid creek with rocky shores, and which the public took upon trust as regarded safe by the defendants who were bound to maintain it and keep it in repair.

Such a bridge appears to the persons travelling over it to be safe until it falls. In practice it is used up to the last moment. The duty therefore of the defendants is not simply to warn, but to prevent its use by closing it up until the danger is removed.

The court therefore in its answer to the plaintiff's 3d point erred in negativing it, because the duty was imposed upon the defendants of either putting the bridge into complete repair or of closing it up so as to prevent the passage of the public ; and therefore if the plaintiff knew the condition of the bridge, he had reason to believe that the defendants did not think so, and therefore they were bound to give him and the public distinct notice or warning not to use the bridge.

It was not a case of contributory negligence on the part of the plaintiff at all. It was the case that defendants, trusting that the bridge would last some months longer, neglected, 1, the duty of repairing ; and 2, the imperative duty of closing it until its dangerous condition was removed. Whilst it was passed over every day by the public, there could not be on the part of any one, by simply using the bridge in the ordinary way, such a contributory negligence as would prevent the plaintiff's recovery

6 P. F. Smith—14

[Humphreys *v.* Armstrong County.]

for an injury which he never would knowingly have been a party in causing.

If the ruling of the court is correct, then it is unnecessary for those who have intrusted to them the maintenance and repair of bridges over our streams and rivers to repair them and keep them in good order and safe for the public, but simply to let them go to decay and become dangerous, but keep them open for public use, and then when an accident happens causing serious bodily injury or even loss of life, proving that its dangerous condition was well known, and leaving it to the jury that if the injured party know of it it was contributory negligence on his part for him to put a foot on it. A railroad company with high trestle bridges, with the same force might say to a passenger, "You knew our road was very dangerous, why did you run the risk of an accident and consequent injury?"

A bridge looks fair until it breaks down; it is not like a pit which you can see and avoid; but an excavation in a street or road made for a lawful purpose must be fenced and lighted, and a dangerous bridge must be closed up.

This case has been tried with extreme positions on both sides, but what we have said above shows that there was error in the rulings of the court.

Judgment reversed, and a *venire de novo* awarded.