### Havens *v.* Strayer, Appellant.

564

Argued May 18, 1937.   Before KEPHART, C. J., SCHAF-
FER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*John B. Cupp*, with him *John E. Cupp* and *Clyde E. Williamson*, for appellant.

*Wm. P. Wilson*, of *Lilley & Wilson*, with him *Lewis G. Shapiro* and *Joseph W. Beaman*, for appellee.

OPINION BY MR. JUSTICE MAXEY, June 25, 1937:
Plaintiff brought an action in trespass to recover damages for the death of her husband, alleged to have been caused by defendant's negligence.

Between the Borough of Jersey Shore and an island in Nippenose Township, Lycoming County, there had been a state bridge on State Highway Route No. 176 crossing a part of the West Branch of the Susquehanna River. The Secretary of the Department of Highways entered into a written contract with the defendant to replace this bridge with a new structure. Under the terms of the contract defendant was permitted either to build a temporary bridge or to move the existing bridge forty feet upstream for the use of the public while the new bridge was being erected. He elected to move the existing bridge. As to the temporary structure the contract provided, inter alia, as follows: "It is understood that provision shall be made by the contractor for the maintenance of two-way traffic at all times over the existing bridge superstructure at its new location and the temporary approaches, except as hereinafter provided. Necessary barricades, warning signs, lights, and watchmen shall be furnished at the direction of the engineer. The contractor shall also place at the limits of the temporary roadway conspicuous signs bringing to the attention of the traveling public the maximum gross load permitted on this structure. This temporary bridge and approaches shall be maintained at the contractor's risk until the new bridge and approaches are open for traffic."

At about 12:30 P. M., on January 1, 1934, defendant's foreman and an inspector for the Department of Highways inspected the temporary bridge and found that it had moved thirty inches in the center. An inspection of the center pier disclosed that the cribbing had moved on the piling. A little later in the day the inspector and the foreman telephoned the District Engineer of the Department of Highways and described what had occurred. The latter stated that he had no authority to close the bridge, as it would be a violation of the contract, but made certain suggestions which the contractor might or might not adopt, if he saw fit. He suggested

that a watchman be placed at each end of the bridge to prevent more than one car crossing it any time. After this telephone conversation, defendant's foreman put a watchman at each end of the bridge, with instructions "only to allow one car on the bridge at a time, and to stop all cars and warn them that the bridge had moved at the center pier, and that they were traveling at their own risk if they crossed the bridge."

About 3:30 in the afternoon in question, plaintiff's husband, as a driver, and one Torrence Irwin, as a passenger, came together to the bridge in a Ford sedan, from the south side of the river headed toward Jersey Shore. As they approached the bridge, defendant's watchman stopped them, told them the bridge had moved and that only one car at a time could go over the bridge. Irwin said, "We can make it," and they drove onto the bridge, and when at about the center pier or a trifle beyond, the bridge began to give way. Both men jumped out of the car and ran for the Jersey Shore side. Before they reached there the bridge collapsed and carried the car and men into the river. Both men were drowned.

The jury returned a verdict for plaintiff in the sum of $15,008. Defendant filed motions for a new trial and for judgment n. o. v. Subsequently, by leave of court, defendant withdrew his motion for a new trial. Defendant's motion for judgment n. o. v. was overruled. He appealed.

Plaintiff claimed that it was the duty of the defendant after having moved the bridge, "to keep same in a proper and safe condition for public travel, erect necessary barricades, warning signals, lights, as well as keep the approaches thereto in a safe and proper condition; duties wholly, wilfully neglected to be performed by the defendant or for him."

Appellant contends that proof of his negligence was wanting. The court below held that there was sufficient

evidence of negligence to go to the jury and based its conclusion largely on the case of *Humphreys v. Armstrong County,* 56 Pa. 204. In that case a county bridge collapsed while Humphreys with his team and wagon was crossing it and he was injured. The verdict was for the defendant and in reversing the judgment and awarding a venire, this court said: "It was the duty of the commissioners to have examined the bridge thoroughly, which they did not, and to make a thorough repair so as to render the bridge perfectly safe, or to close it up so as to prevent the public using a dangerous part of the highway of which they could not have any accurate knowledge. They did neither, but merely did that which they thought would make it last till spring, becoming *quasi* insurers that it would last so long. . . . The duty of the defendants was therefore plain and positive to close up the bridge, and if it had been done this accident could not have happened. . . . Instead of this they permitted it to be used by the public generally with loaded wagons and horses and on foot. . . . Such a bridge appears to the persons traveling over it to be safe until it falls. In practice it is used up to the last moment. The duty therefore of the defendants is not simply to warn, but to prevent its use by closing it up until the danger is removed." In *Travers v. Delaware County,* 280 Pa. 335, 124 A. 497, this court said: "It is the duty of the county commissioners to make such inspections as are from time to time required, so that the bridges within their control,—part of the public highways,—are kept in safe condition, and suitable for the movement of traffic reasonably to be expected to pass across. To effect this end, they must employ suitable engineers to perform the service of inspection so that the strength of the structures committed to their care may be determined: *McCormick v. Township,* 112 Pa. 185 [4 A. 164]. When defects are brought to their attention, necessary changes must be made, and the highway

568

closed in the meantime if there is apparent danger: *Humphreys v. Armstrong Co.*, 56 Pa. 204."

Appellant's contention that he as a contractor had performed his full duty when he erected the temporary bridge of the character and design used by others engaged in the same line of business, must be rejected. The duty of maintaining this temporary bridge involved the duty of maintaining it in such a condition as to be safe for those who passed over it or to close it for traffic. Equally untenable is appellant's contention that he had no authority to close the bridge to traffic. This bridge was at the time under defendant's control. The duty of "maintenance" was expressly placed upon him. It is true that his contract provided that he should maintain "two-way traffic at all times over the existing bridge superstructure at its new location," but this clearly did not mean that the bridge had to be kept open by him no matter at what hazard to the lives and limbs of the users. Surely if a section of the bridge had been swept away by ice or flood, appellant could not reasonably contend that it was still his duty to maintain traffic over that bridge. Courts do not interpret contracts as calling for literal adherence to their language when such adherence means the sacrifice of human lives. The very next sentence of the contract referred to provides that "necessary barricades, warning signs, lights and watchmen shall be furnished at the direction of the engineer." The reference to barricades is a recognition of the fact that under certain circumstances the defendant might be required in the interest of public safety to "barricade" the bridge. Even in the absence of such a provision, there rests by implication of law upon every individual or corporation in possession of a bridge the duty of barricading that bridge to traffic when it is unfit to bear traffic. The possession of any kind of property carries with it the obligation to take every reasonable precaution to prevent people from being injured by that

property. If a man owned or possessed a building which was in momentary danger of collapse, his duty to keep people away from that building could not be shirked. We said in *Bisson v. Kelly, Inc.,* 314 Pa. 99, 110, 170 A. 139: "It is a primary *social* duty of every person to take thought and have a care lest his action result in injuries to others. This social duty *the law* recognizes and enforces, and for any injury resulting from any person's lack of elementary forethought, the law holds that person accountable. A normal human being is held to foresee those injuries which are the consequence of his acts of omission or commission which he, as a reasonable human being, should have foreseen." In *Pope v. Reading Co.,* 304 Pa. 326, 333, 156 A. 106, we said: "Negligence has been often and authoritatively defined as 'want of care under the circumstances.' The word 'circumstances' is comprehensive. It embraces the entire sum of the attendant facts, including the operation of the forces of nature so far as they bear upon or relate to the happening of the central event. A person is charged with ordinary knowledge of the workings of these forces, and his conduct, if it is to escape being stigmatized as wanting in care, must conform to the normal workings of the forces of nature. At common law it was held that every man must have some knowledge 'of the quality of his beast' (1 Hale P. C. 430) and use appropriate means to keep that beast from harming people. Public welfare requires that this same salutary rule apply to the inanimate objects in a man's possession and subject to his intelligent control."

It is the further contention of appellant that "the bridge was closed for all practicable purposes to all parties who gave heed to the warning of watchmen stationed at both ends of the bridge." If the watchmen had been instructed to say to those who manifested an intention to cross the bridge that the bridge was "closed" and that no person could cross it except at great peril to himself,

there would be much validity to appellant's argument in this respect. But the construction engineer testified that his instructions to the watchman at each end of the bridge was "to only allow one car on the bridge at a time and to stop all cars and warn them that the bridge had moved at the center pier, and that they were traveling at their own risk if they crossed the bridge." That was not only keeping the bridge open but inviting the traffic of those willing to take the risk.

We agree with the court below that the question of defendant's negligence was for the jury. Likewise, the question of the negligence of plaintiff's husband was for the jury. Defendant's watchman testified that he told plaintiff's husband and his companion, Mr. Irwin, that the bridge had moved and "only one car at a time could go over." It cannot be said as a matter of law that a man is negligent who starts to cross a bridge after being told *in effect* by the watchman stationed there that "one car at a time can go over." It was not a departure from the standards of ordinary prudence for plaintiff's decedent to interpret what the watchman said to him as meaning that it was reasonably safe for him in his car to cross the bridge so long as no other car was on the bridge at the same time.

The other questions submitted in this case, including the alleged excessiveness of the verdict, appear to us as being without merit and require no discussion.

The judgment is affirmed.